UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
TERI WOODS PUBLISHING, LLC,                  :
                                             :
                        Plaintiff,           :          **MEMORANDUM & ORDER**
            -against-                        :          **23-cv-507 (DLI) (TAM)**
                                             :
AMAZON.COM, INC., AUDIBLE, INC.,             :
BLACKSTONE AUDIO, INC., and URBAN            :
AUDIO BOOKS, LLC,                            :
                                             :
                        Defendants.          :
-------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On January 24, 2023, Plaintiff Teri Woods Publishing, LLC ("Plaintiff" or "Woods Publishing") filed this action alleging breach of contract claims against Defendant Urban Audio Books, LLC ("Urban Audio") and copyright infringement claims against Defendants Amazon.com, Inc. ("Amazon"), Audible, Inc. ("Audible"), Blackstone Audio, Inc. ("Blackstone") (the three, collectively, "Downstream Defendants"), and Urban Audio (the four, collectively, "Defendants"). *See*, Compl., Dkt. Entry No. 1. Specifically, Woods Publishing alleges that Urban Audio breached the terms of a copyright license agreement between them for the production and distribution of audiobooks based on Woods Publishing's copyrighted works and the implied covenant of good faith and fair dealing. Plaintiff further alleges that all Defendants infringed on Woods Publishing's copyrights, and Urban Audio and Blackstone allowed others to infringe those copyrights as well. Compl. at ¶¶ 1-2, 65-94. Plaintiff invokes the Court's original federal question jurisdiction relating to the copyright claims, and its supplemental jurisdiction over the state law contract claims as related to the federal claims. *Id.* at ¶ 15; *See,* 28 U.S.C. §§ 1331 and 1338; U.S. Copyright Act of 1976, 17 U.S.C. §§ 101 *et. seq.*; and 28 U.S.C. § 1367(a), respectively.

Downstream Defendants moved to dismiss the Complaint for failure to state a claim

pursuant to Fed. R. Civ. P. Rule 12(b)(6) as did Urban Audio. "Downstream Mot.", Dkt. Entry No. 27; "UAB Mot.", Dkt. Entry No. 29. Plaintiff separately opposed each motion. Pl.'s Opp'n to Downstream Mot. ("Opp'n to DS"), Dkt. Entry No. 35; Pl.'s Opp'n to UAB Mot. ("Opp'n to UAB"), Dkt. Entry No. 36. Defendants replied in support of their respective motions. Reply in Supp. of Downstream Mot. ("Downstream Reply"), Dkt. Entry No. 37; Reply in Supp. of UAB Mot. ("UAB Reply"), Dkt. Entry No. 38.

For the reasons set forth below, Defendants' motions are granted as to the federal claims; the Court declines to exercise its supplemental jurisdiction, and this action is dismissed.

## **BACKGROUND**[1]

**I.     The Parties**

Plaintiff, the publishing company for author Teri Woods, is a New York limited liability company, with its "principal office" at 19834 Hopkins Road, Lewes, Delaware. Compl. at ¶¶ 1, 10. It owns or is the exclusive licensee of the copyrights to Teri Wood's books and the books of other authors. *Id.* at ¶¶ 22, 25.

Defendant Urban Audio is a New York limited liability company with its principal place of business at 144 North 7th Street #255, Brooklyn, New York 11249. Compl. at ¶ 14. Defendant Amazon is a Delaware Corporation, with its principal place of business at 410 Terry Avenue North, Seattle, Washington 98109-5210. Securities and Exchange Commission, Amazon 2022 Annual Report, https://s2.q4cdn.com/299287126/files/docfinancials/2023/ar/Amazon-2022-Annual-Report.pdf; Compl. at ¶ 11. Defendant Audible, a subsidiary of Amazon, is a Delaware corporation with its principal place of business in Newark, New Jersey. Compl. at ¶ 12. Defendant

---

[1] The following facts are taken from the Complaint and any documents incorporated therein or that the parties are presumed to have knowledge of, and are accepted as true as they must at this stage of the case.

Blackstone is an Oregon corporation with its principal place of business in Ashland, Oregon. *Id.* at ¶ 13. All the Defendants operate audiobook subscription streaming services. *Id.* at ¶ 4.

## II.    The Agreement

On December 19, 2018, in Brooklyn, New York, Woods Publishing and Urban Audio entered into a License Agreement ("Agreement") for the creation and distribution by Urban Audio of readings of twenty (20) of Woods Publishing's titles ("Licensed Works"). *Id.* at ¶ 25; License Agreement ("Agrmt."), Dkt. Entry No. 1-1. Woods Publishing represented and warranted that it was "the sole and exclusive owner of the copyright and literary rights pertaining to the literary works(s) and title(s)" governed by the Agreement. Agrmt. at 1.

At issue are the rights licensed to Urban Audio and the remuneration due Woods Publishing specifically under Sections I and II of the Agreement. Compl. at ¶¶ 25, 26, 45; Agrmt. at § I ("Rights Section") and § II ("Royalties Section"). In the Rights Section, Woods Publishing granted to Urban Audio the:

> "exclusive unabridged audio publishing rights, to manufacture, market, sell and distribute copies throughout the World, and in all markets, copies of unabridged readings of the [Licensed Works] on cassette, CD, MP3-CD, pre-loaded devices, as Internet downloads and on, and in, other contrivances, appliances, mediums and means (now known and hereafter developed) which are capable of emitting sounds derived for the recording of audiobooks."

Agrmt. at § I.

Subsection 1 of the Royalties Section sets forth the compensation Urban Audio will pay Woods Publishing on the receipts generated by the audiobooks:

> "As consideration for the aforementioned rights and License granted by Licensor to Licensee, Licensee shall pay to Licensor a sum equivalent to:
>
>     (a) Ten percent (10%) of Licensee's net receipts from catalog, wholesale and other retail sales and rentals of the audio recordings of said literary work;
>
>     (b) Twenty Five percent (25%) of net receipts on all internet downloads of said literary work.

3

>       (c) Twenty Five percent (25%) of net receipts on Playaway format [under certain conditions]."

*Id.* at § II. 1. [2]   Subsection 2 of the Royalties Section defines "net receipts" for purposes of the Agreement, as well as the procedure for providing payment and a statement of sales and royalties semi-annually.  *Id.*  Net receipts are "actual cash proceeds received by [Urban Audio], after deducting a twenty percent (20%) reserve, returns, discounts and allowances, and sales taxes, shipping and handling charges which may be included in the sales or rental prices, but without deductions of any other kind." *Id.*  The Agreement further provides that it is to be governed by the laws of the State of New York and that the parties "submit to the jurisdiction of the Courts of the State of New York." *Id* at 3.

### III. Distribution of the Licensed Works on Subscription Streaming Platforms

This dispute arises out of Defendants' distribution of the Licensed Works as digital streams via their subscription streaming platforms.  Compl. at ¶¶ 2-4.  After signing the Agreement in late 2018, Urban Audio initially "did not distribute any Licensed Works as digital streams." *Id.* at ¶ 30.  Sometime in 2020, this changed, and Defendants began distributing the audiobooks as digital streams. *Id.* at ¶ 31.  Around the same time, sales of the Licensed Works "substantially increased," while Plaintiff's "royalties plummeted." *Id*.

Woods Publishing attributes these trends to Defendants', especially Amazon's and Audible's, subscription payment model for their streaming services.  *Id.* at ¶¶ 37-42, 46-53.  Specifically, Plaintiff alleges that features of Amazon's and Audible's payment model distribute the Licensed Works for free to their subscribers.  *Id.*  According to Plaintiff, Defendants distributed the Licensed Works without charging adequate prices by allowing subscribers to use credits, which

---

[2] None of the parties contend that the Playaway format or its sales are relevant to the dispute here. The use of the term "format," however, is useful in characterizing the list in Section I for purposes of this discussion.

4

were provided at the time of initial subscription and monthly thereafter, to obtain the works permanently. *Id.* at ¶ 39. Plaintiff, in turn, received only a fraction of the listed retail price of the Licensed Works. *Id.* at ¶¶ 32-33. This distribution was alleged to be ongoing at the time the Complaint was filed. *Id.* at ¶ 25.

Plaintiff further alleges that the subscription streaming model violates the Agreement by allowing fractional distributions of the Licensed Works through Amazon's and Audible's use of "Qualified Listens" to calculate the royalty payments from digital streams of works. *Id.* at ¶¶ 43-45. According to an email from Urban Audio quoted in the Complaint, when a subscriber listens to more than five minutes of a Licensed Work, this constitutes a "Qualified Listen." *Id.* at ¶ 44. Amazon and Audible then use the total minutes of Qualified Listens to calculate their royalty payments to Woods Publishing. *Id.* Plaintiff argues that this violates the Agreement because the Agreement does not permit distribution of abridged readings. *Id.* at ¶¶ 44-45.

Finally, Plaintiff alleges that Urban Audio and Blackstone have similar audiobook subscription streaming services. *Id.* at ¶¶ 46-47. Both of these Defendants offer subscriptions where subscribers receive monthly credits that they can redeem for an audiobook. *Id.* at ¶¶ 46-51. The same problems regarding underpayment of royalties resulted. *Id.* at ¶ 52.

## DISCUSSION

### I. Legal Standard

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard "does not require 'detailed factual allegations,' but it demands more than . . . unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

5

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court accepts as true all well pled factual allegations and draws all reasonable inferences in the plaintiff's favor. *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009) (citations omitted). Nevertheless, "threadbare recitals of the elements of a cause of action" that are supported by "conclusory" statements and mere speculation are inadequate and subject to dismissal. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted); *See also*, *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. . . . Pleadings that are no more than conclusions are not entitled to the assumption of truth.") (internal quotation marks and modifications omitted). The court's duty "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 113 (2d Cir. 2010).

"In general, the review is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). While the Court generally considers only facts alleged in the complaint or contained in documents attached or incorporated by reference, other facts and documents can "be appropriately considered if [they are those] upon which the complaint solely relies and [are] integral to the complaint." *Lohan v. Perez*, 924 F. Supp.2d 447, 453 (E.D.N.Y. 2013) (modifications, quotations, and internal citation omitted). "The Court may properly consider 'documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" *Spinnato v. Unity of Omaha Life Ins. Co.*, 322 F. Supp.3d 377, 399 (E.D.N.Y. 2018) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

6

## II. Choice of Law

The Court must determine which state's law to apply here. *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999). A federal court exercising supplemental jurisdiction must apply choice of law rules of the forum state and New York law gives full effect to the choice of law provision in a contract. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012) (citing *Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989)). *Krock v. Lipsay,* 97 F.3d 640, 645 (2d Cir.1996). Here, New York law applies to the interpretation of the Agreement and the breach of contract claims because: (1) the Agreement states that it "shall be construed and enforced in accordance with the laws of New York;" (2) the parties have not raised a choice of law issue; and (3) both parties rely on New York law in support of their respective positions. *See,* Agreement at 3; S*ee also*, *Tehran-Berkeley Civil & Envtl. Engineers v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989) (finding implied consent to use a forum's law where parties' briefs relied on New York law).

## III. Analysis

At the heart of this dispute lies the scope of the Agreement and whether Defendants were permitted to distribute the Licensed Works as digital streams via their subscription streaming platforms. Plaintiff contends Defendants exceeded the scope of the Agreement thereby violating its copyrights and materially breaching the contract. *See generally*, Compl. Defendants counter that that their activities were within the Agreement's ambit. *See,* Downstream Mot. at 1-2; UAB Mot. at 1-2.

Section XI(3) of the Agreement allows Urban Audio to assign the Agreement and "any or all of the rights granted to it." Agrmt. at 3. It is undisputed that, under this Section, Urban Audio validly could assign any of the rights within the Agreement's scope to Blackstone and Blackstone,

7

who, in turn, could assign these rights.  Thus, the Court's analysis hinges on the terms of the Agreement as the existence of a valid license, which Defendants argue they held, is a complete defense to a copyright violation claim.  *See, Spinelli v. Nat'l Football League*, 903 F.3d 185, 197 (2d Cir. 2018) ("Disputes involving the scope of a license present courts with a question of contract.").  Consequently, the fundamental question is whether the Agreement conferred the right to Urban Audio to distribute recordings of the Licensed Works via its subscription streaming format.

### A.  Direct Copyright Infringement Against all Defendants

Defendants maintain that Plaintiff's claims of copyright infringement must be dismissed primarily because Defendants' activities were within the scope of the Agreement.[3]  UAB Mot. at 5-8; Downstream Mot. at 5-7.  Two elements must be established to support a copyright infringement claim: "(1) ownership of a valid copyright; and (2) infringement on the copyright by defendant[s]."  *Spinelli*, 903 F.3d at 197. (quotations omitted).  While an exclusive licensee of copyrighted works might breach the contract conferring those rights, it "cannot be liable for infringing the copyright rights conveyed to it."  *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 695 (2d Cir. 1991).  If possession of a license is not in dispute, the copyright owner bears the burden of showing that the activities exceeded the scope of the license.  *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995).

In determining the meaning of a contract, the Court "look[s] to all corners of the document rather than view sentences or clauses in isolation."  *Int'l Klafter Co. v. Cont'l Cas. Co.,* 869 F.2d 96, 99 (2d Cir.1989) (internal quotation marks omitted).  The "primary objective is to give effect

---

[3] Urban Audio also moves to dismiss claims of copyright infringement as to fourteen (14) of the Licensed Works on standing grounds alleging Plaintiff does not own the copyright to those works and did not provide sufficient factual allegations to establish its exclusive license to those works.  UAB Mot. at 8-10.  For the reasons discussed below, the Court need not reach or decide this argument to resolve the instant motions.

to the intent of the parties as revealed by the language they chose to use." *Bolt Elec., Inc. v. City of New York,* 223 F.3d 146, 150 (2d Cir. 2000). Courts "must give 'effect and meaning . . . to every term of [a] contract' and strive 'to harmonize all of its terms.'" *Spinelli*, 903 F.3d at 200 (quoting *India.Com, Inc. v. Dalal*, 412 F.3d 315, 323 (2d Cir. 2005)). "Interpretations 'that render provisions of a contract superfluous' are particularly disfavored." *Id.* (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002).

Under New York law, interpretation of an unambiguous contract is a question of law for the Court to decide without extrinsic evidence. *Id.* However, "if 'the intent of the parties can[not] be ascertained from the face of their agreement,' the contract is ambiguous and its interpretation presents a question of fact." *Id.* (quoting *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2nd Cir. 2005). "Contract language is unambiguous when it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989)) (changes in original). On the other hand, "[a]mbiguous language is language that is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) (quoting *Seiden Associates v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992)).

Here, the Agreement captures the parties' clear intent to grant Urban Audio broad rights to publish and monetize unabridged copies of audio recordings of the Licensed Works. While the Court has considered the contract as a whole, of particular relevance to this dispute are the Rights

9

Section and Royalties Section of the Agreement, which contain the essential elements of the exchange between Woods Publishing and Urban Audio. *See*, *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir.1989) (courts must review contracts as a whole).

The Rights Section sets out the rights Woods Publishing grants Urban Audio under the Agreement, specifically, the "exclusive unabridged audio publishing rights to manufacture, market, sell and distribute copies" of the Licensed Works. Agreement § I. As to the delivery method or format of these copies, the Agreement's language is expansive, anticipating future technological developments, and encompassing "cassette, CD, MP3-CD, pre-loaded devices, as Internet downloads and on, and in, other contrivances, appliances, mediums and means (now known and hereafter developed)." *Id*.

The Downstream Defendants contend that streaming services are included in the phrase "Internet downloads," while Plaintiff disagrees. Downstream Mot. at 5-7; Opp'n to DS at 11 (referring to internet downloads in the context of Agreement subsection II(1)). Even assuming, *arguendo,* that "Internet downloads" does not include services like those Defendants provide, streaming services still would fall within the phrase "other contrivances, appliances, mediums and means (*now known and hereafter developed*)." Agreement at § I (emphasis added). There is no dispute that audio streaming via the internet was a technology in use at the time of the Agreement and, as such, the Court finds that streaming is encompassed in Section I of the Agreement. Moreover, under the approach utilized in this Circuit, the phrase "other contrivances, appliances, mediums and means (now known and hereafter developed)" includes streaming technology and there is no reasonable reading of that phrase that might exclude it. *See, e.g.*, *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 486-87 (2d Cir. 1998) (discussing approach to "new use" cases).

Plaintiff makes no attempt to dispute this, but instead puts forth two arguments as to why aspects of Defendants' distribution model violate other language contained in the Agreement. Opp'n to DS at 9. First, Plaintiff contends that the terms of the Royalties Section prohibit Defendants' subscription streaming services, specifically asserting that this distribution model is not contemplated by the Agreement. Opp'n to UAB at 9-14; Opp'n to DS at 10; S*ee, Int'l Klafter Co.,* 869 F.2d at 99. Essentially, Plaintiff contends that subscription streaming revenue does not fit clearly into one of the Royalties Section's three listed revenue buckets, *i.e.,* that: (1) a subscription streaming service is not a catalog, wholesale and other retail sales or rentals for purposes of clause (a); (2) streaming is not an internet download for purposes of clause (b); and (3) it is not encompassed in Playaway format sales in clause (c). Opp'n to DS at 10-14. The parties agree that subscription streaming services should not be encompassed in Playaway format sales. *See,* Opp'n to DS at 10; Downstream Mot. at 7. According to Plaintiff's logic, clause (a) or clause (b) must encompass distribution of the Licensed Works via a subscription streaming service, otherwise Defendants have committed copyright infringement.

However, it is unnecessary for the Court to decide how Plaintiff should be compensated for digital streams under the Royalties Section because the copyright claims must be dismissed based on the Court's finding that distribution of the Licensed Works on Defendants' subscription streaming platforms was, in fact, within the scope of the Agreement as discussed further below.

Plaintiff relies on *Spinelli* for its position, but it misinterprets the Circuit's findings in that case. Opp'n to DS at 16-18. As in this case, *Spinelli* involved a license agreement concerning copyrighted materials, although *Spinelli* involved photographs. In *Spinelli,* the Circuit concluded that the defendants' interpretation of the agreement, which would have allowed them to license plaintiffs' photographs without paying plaintiff any royalties so long as compensation for the

11

photographs was not paid on a per-image basis, was "manifestly at odds with what the parties intended," making the contract ambiguous. *Spinelli*, 903 F.3d at 201. The Circuit agreed with the plaintiff's interpretation that the license did not permit the sublicensing of plaintiff's photographs on anything other than a per-image basis and, thus, the licensee had acted beyond the scope of the license. *Id.* at 202.

Here, the Agreement differs from the agreement in *Spinelli* because the Royalties Section does not require Plaintiff to be compensated only on a per-book basis. The only mention in the Agreement of requiring payment on a per unit basis is in clause II(1)(c) dealing with Playaway format sales. As noted previously, the parties agree that streaming could not be categorized as Playaway format sales. *See,* Opp'n to DS at 10. However, this explicit language requiring payment on a per unit basis in this subsection notably is absent in the preceding two clauses, Sections II(1)(a) and II(1)(b), and elsewhere in the Agreement.

The parties clearly knew how to specify when payment was due on a per unit basis. The omission of such terminology in reference to other revenue channels, or in the definition of net receipts, indicates that the parties intended no such requirement. *See*, *Waldman ex rel. Elliott Waldman Pension Tr. v. Riedinger*, 423 F.3d 145, 150 (2d Cir. 2005) (finding the terms of an agreement unambiguous where groups excluded from settlement agreement could have been specified, but were not). Thus, when considered in its entirety, the Royalties Section contains no implied restriction to per unit sales comparable to that which dictated the outcome in *Spinelli.*

Other sections of the Agreement support this conclusion. Section III obligates the Licensee to maintain "complete records which detail all sales, rentals, transactions, receipts, and expenses." Agrmt. at § III. By adding "transactions" and "receipts" to sales and rentals, this indicates the parties contemplated a broader range of revenue models than Plaintiff's per unit basis

12

for compensation. *Spinelli*, 903 F.3d at 200 (courts must give effect to every term of a contract). Revenue from subscription fees for streaming logically would fit within the ambit of "transactions" and/or "receipts."

Plaintiff's argument that the Royalties Section prohibits subscription streaming services cannot be reconciled with a comprehensive reading of the entire Agreement. Despite Plaintiff's allegation that "[Urban Audio] agreed to pay [Woods Publishing] royalties on a per unit basis," no such promise exists in the Agreement. *See*, Compl. at ¶ 26. Defendants were within the scope of the Agreement when they distributed the Licensed Works on their subscription streaming services and Plaintiff's arguments do not persuasively narrow the scope of the license granted by the Agreement. While distribution of the Licensed Works via subscription streaming service may not have been explicit in the Agreement, its unambiguous terms encompass that right.

Ultimately, Plaintiff's arguments fail because they are contrary to the plain meaning of the phrase "other contrivances, appliances, mediums and means (now known and hereafter developed)," which would include digital streams and other future technological developments in distribution services and is contrary to the law of this Circuit as discussed above.

Second, Plaintiff argues that Defendants have allowed the Licensed Works to be distributed in an abridged format, via "listens" shorter than five minutes, in violation of the express terms of the Rights Section, specifically the restriction of rights to unabridged copies of the Licensed Works. Opp'n to DS at 14-15. This argument fails because the Complaint does not allege plausibly that Defendants distributed abridged copies of the works.

Abridge and abridgment have similar meanings according to Black's Law Dictionary, which defines abridge as "[t]o condense (as a book or other writing)," and abridgment as "[a] condensed version of a longer work". Black's Law Dictionary 10th Edition. The Complaint does

13

not allege any facts to support the proposition that any of the Defendants produced versions of the Licensed Works that were condensed or otherwise altered from the original in any way. The fact that a listener could choose to listen to less than the entire book, does not make the copy "abridged" in violation of the Agreement.

The Court finds that the Agreement unambiguously granted Urban Audio the right to distribute the Licensed Works through subscription streaming services. Urban Audio's subsequent sublicense of this right to the Downstream Defendants also was in accord with the Agreement. Therefore, Defendants' motions to dismiss Count III of the Complaint are granted.

### B. Secondary Copyright Infringement Against Urban Audio and Blackstone

"A contributory infringer is 'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another.'" *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 99–100 (2d Cir. 2016) (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). However, "an exclusive licensee of any of the rights comprised in the copyright, though it is capable of breaching the contractual obligations imposed on it by the license, cannot be liable for infringing the copyright rights conveyed to it. " *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 695 (2d Cir. 1991) (citing *Fantastic Fakes, Inc. v. Pickwick International, Inc.,* 661 F.2d 479, 483–84 (5th Cir. Unit B 1981) and 3 M. Nimmer & D. Nimmer, *Nimmer On Copyright,* § 12.02 at 12–29 (1990) ("[o]nce the copyright owner grants an exclusive license of particular rights, only the exclusive licensee and not his grantor may sue for later occurring infringements of such rights."). As discussed above, the Agreement granted expansive audio publishing rights to the Licensed Works to Urban Audio. *See,* Section A *supra*. The rights were fully assignable. See, Agreement at XI(3). It is undisputed that Urban Audio assigned the rights to Blackstone and Blackstone who, in turn,

sublicensed the rights to Amazon and Audible.

The Court has determined that Defendants did not exceed the scope of the Agreement's license. As such, Plaintiff has no claim for secondary copyright infringement on the Licensed Works against Urban Audio or Blackstone. Therefore, Defendants' motions to dismiss Count IV of the Complaint are granted.

### C. Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

Plaintiff's remaining claims, breach of contract by Urban Audio (Count I) and breach of the implied covenant of good faith and fair dealing by Urban Audio (Count II), sound in New York law of contract. As the Complaint alleged related violations of federal copyright law, Plaintiff properly invoked the Court's supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a). Compl. at ¶ 15. However, the Court declines to exercise its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3).

The Court has balanced the following factors in reaching its decision not to exercise its supplemental jurisdiction: (1) the federal copyright law claims are dismissed; (2) this case is in its very early stages, *i.e,* Defendants have not interposed an answer to the Complaint, and discovery barely has begun, if any at all has been conducted to date (*See,* Minute Entry for Status Conf. before Magistrate Judge on Feb. 22, 2024); (3) the agreement contemplates the application of New York law; and (4) the remaining claims sound in New York contract law. The Court has "balance[d] the traditional 'values of judicial economy, fairness, and comity [] in deciding whether to exercise jurisdiction." *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (citations omitted). "In weighing these factors, the district court is aided by the Supreme Court's additional guidance in *Cohill* that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the

remaining state-law claims.'" *Id.* (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7 (1988).

## **CONCLUSION**

For the reasons set forth above, Defendants' motions to dismiss Plaintiff's federal copyright infringement claims in Counts III and IV are granted with prejudice, and the Court declines to exercise supplemental jurisdiction over the remaining state law claims, which are dismissed without prejudice .  Accordingly, this case is dismissed.

SO ORDERED.

Dated: Brooklyn, New York
March 30, 2024

/s/
DORA L.  IRIZARRY
United States District Judge